IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )          No. 3:10-CR-133
                                         )
NATHANIEL MAURICE PARKER,                )          (PHILLIPS/SHIRLEY)
                                         )
                    Defendant.           )

## REPORT AND RECOMMENDATION

This case is before the Court on the Defendant's Motion to Suppress Evidence [Doc. 17], filed on December 17, 2010. The motion was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). The Court held an evidentiary hearing on January 14, 2011. Assistant United States Attorney Kelly A. Norris represented the government. Attorney Jonathan A. Moffatt appeared on behalf of the Defendant, who was also present. The Court took the evidence, the arguments, and the parties' briefs under advisement on January 15, 2011.

## I. POSITIONS OF THE PARTIES

The Defendant was charged in a one-count Indicted [Doc. 3] as being a felon in possession of a firearm and ammunition. The Defendant asks [Doc. 17] for the suppression of all evidence seized by the Government which resulted from a traffic stop and seizure of the Defendant on or about August 24, 2010. [Doc. 17]. The Defendant argues that the automobile stop and the

1

subsequent search and seizure were conducted in violation of his constitutional rights under the Fourth Amendment. [Doc. 17]. The Defendant asserts that the police officers lacked probable cause to stop his vehicle and "to detain, or otherwise seize, [him]." [Doc. 17]. As a result of the illegal traffic stop, the Defendant contends that all evidence must be suppressed as "fruits of the poisonous tree."[1] [Doc. 17]. Therefore, the Defendant argues that the firearm and ammunition recovered by the Government as a result of the traffic stop should be suppressed in this case. [Doc. 17].

The Government responds [Doc. 20] that the Defendant's argument fails for two reasons. First, the Government asserts that the Defendant was "lawfully seized because the traffic stop was supported by probable cause." [Doc. 20]. Second, the Government contends that even if the Court finds that the traffic stop was not supported by probable cause, the seizure of the firearm and bullet was a product of a new and distinct crime, rendering suppression of the evidence an inappropriate remedy. [Doc. 20].

## II. TESTIMONY FROM THE JANUARY 14, 2011, EVIDENTIARY HEARING

### A. Testimony of Officer Joshua Hurst

#### (i) Direct Examination

Officer Joshua Hurst testified that he is employed by the Knoxville Police Department ("KPD"). Officer Hurst testified that he has worked for KPD for seven years and currently holds the

---

[1]The Defendant also argues that "[a]ny and all statements made by [him] after, or in conjunction with, the violations of his Fourth Amendment rights, should be suppressed." [Doc. 17 at 1]. The Court notes, however, that the Defendant does not cite the Court to any such statements which he seeks to suppress, nor was any evidence presented at the hearing concerning such statements. At the hearing, the Defendant stated that there was no statement he sought to have suppressed in this case.

position of Police Officer II. Officer Hurst stated that he received training to become a police officer at the KPD academy. During his time with the KPD, Officer Hurst testified that he has conducted "several hundred" traffic stops, and conducted hundreds of traffic stops based as a result of speeding violations.

Officer Hurst testified that he became involved with the Defendant, Nathaniel Parker, on August 24, 2010, at approximately 11:15 p.m. On August 24, 2010, Officer Hurst explained that he was on "regular moving patrol" and was heading south on Harrison Street, when he observed a vehicle exiting the Bi-Lo gas station on 2700 Martin Luther King ("MLK") Avenue. Officer Hurst stated that the vehicle exited onto MLK Avenue "kind of straddling" the yellow line and "made an abrupt turn" onto Harrison Street and "accelerated down Harrison." Officer Hurst testified that the Defendant was traveling at a rate of speed over the posted speed limit of thirty miles per hour when driving down Harrison Street. Officer Hurst stated that, based on his training and the "way the vehicle was moving," he approximated the Defendant's speed at approximately thirty-five miles an hour.

Officer Hurst was shown a drawing that depicted the MLK Avenue and Harrison Street intersection, which was entered as Exhibit 1. Using the drawing, Officer Hurst indicated that he was driving southbound on Harrison Street. Officer Hurst stated that there are two exits from the Bi-Lo gas station, but the Defendant exited onto MLK Avenue. Officer Hurst testified that the Defendant pulled out of the parking lot of the Bi-Lo gas station, briefly stayed on MLK Avenue, then made an abrupt turn onto Harrison Street going southbound. Officer Hurst testified that when the Defendant exited the Bi-Lo gas station onto MLK Avenue, he witnessed the Defendant's vehicle cross the center line.

Upon witnessing the Defendant speeding, Officer Hurst stated that he continued through the intersection of MLK Avenue and Harrison Street, and "caught up with [the Defendant] as he was turning eastbound onto Wilson Avenue." At this point, Officer Hurst stated that he activated his emergency equipment, signaling the Defendant to stop. Once the Defendant's vehicle came to a stop, Officer Hurst stated that he exited his vehicle and approached the Defendant's vehicle. Officer Hurst testified that he noticed the Defendant "making a lot of extra movement" before he made it to the Defendant's driver's side window. Officer Hurst stated that the Defendant was sitting in the driver's seat of the vehicle and "kind of reaching under the seat and bouncing around." Upon witnessing the Defendant's movements, Officer Hurst testified that he drew his firearm and began giving the Defendant verbal commands to show his hands. Officer Hurst testified that his reaction was the result of the Defendant's behavior. Officer Hurst stated that the Defendant's behavior was "not normal" for someone during a traffic stop.

Officer Hurst testified that upon giving the Defendant verbal commands, the Defendant failed to immediately comply. Officer Hurst stated that the Defendant continued to "move around a little bit" and that he continued to shout at the Defendant. Officer Hurst asserted that the Defendant eventually placed his hands out of the driver's side window. After the Defendant placed his hands outside of the vehicle's driver's side window, Officer Hurst stated that he approached the vehicle, could see inside the vehicle, and observed the Defendant's wallet on his leg. Officer Hurst asserted that one person was in the car, and that was the Defendant, Nathaniel Parker.

Once Officer Hurst approached the vehicle, Officer Hurst testified that he asked the Defendant why "he was moving around so much" and "why he was driving so crazy." In response, Officer Hurst testified that the Defendant was laughing quite a bit, and said something about leaving

the gas station, and then an ex-girlfriend. Officer Hurst testified that the Defendant did not deny Officer Hurst's statement that he was driving crazily. As Officer Hurst continued to speak with the Defendant, he testified that a call from his beat partner came through the radio asking him if he was with Nathaniel Parker. Officer Hurst testified that when a traffic stop is conducted, "we usually call in the license plate of the vehicle." In addition, Officer Hurst testified that officers have the ability to run license plates from their cruisers. Officer Hurst stated that the Defendant heard the radio call and affirmed that he was Nathaniel Parker.

Officer Hurst testified that he asked for the Defendant's driver's license and registration. Officer Hurst stated that the Defendant asserted that the vehicle was registered to him. Officer Hurst testified that the Defendant gave him his driver's license and insurance card. Officer Hurst testified that upon receiving the Defendant's driver's license and insurance card, he told the Defendant to stop moving around, and walked to the back of the police cruiser. Officer Hurst testified that he walked to the back of his police cruiser based on the Defendant's actions when he first stopped the vehicle. Officer Hurst explained that "if something was wrong or if [the Defendant] had a firearm or something, I would have some cover between me and [the Defendant]." Officer Hurst stated that he was standing outside of the trunk on the passenger's side of his police cruiser.

Officer Hurst testified that he attempted to complete a records check on the Defendant in order to determine whether the Defendant had any warrants and to check his license status. Officer Hurst testified that a records check may be completed outside of a police cruiser via radio. While attempting to complete the records check, Officer Hurst stated that his partner, Officer Headrick, had turned onto Wilson Avenue where Officer Hurst stopped the Defendant's vehicle. Officer Hurst testified that when the Defendant saw the second police car, he again began to "move

around" in the vehicle. Upon observing the Defendant moving around in the vehicle, Officer Hurst stated that he drew his firearm again and began approaching the vehicle giving the Defendant "verbal commands to stop moving around." In response these commands, Officer Hurst testified that the Defendant opened the driver's side door and "bailed out on foot."

Officer Hurst testified that the Defendant crossed Wilson Avenue northbound into an alley. Officer Hurst stated that he attempted to chase the Defendant. While in pursuit of the Defendant, Officer Hurst testified that he could "hear the distinct sound of metal clanging on to the paved part of the alley." Officer Hurst testified that he saw the Defendant "reach down and attempt to pick something up as he was running." Once Officer Hurst arrived at the spot where he heard the noise, and testified that he observed a "black Glock firearm laying . . . in the alley."

Officer Hurst testified that when the Defendant fled the vehicle, he saw an object in one of his hands, which was later identified as a cell phone. In addition, Officer Hurst stated that the Defendant's right hand was under his shirt when he fled the vehicle. Officer Hurst testified that it appeared that a "shape of a slide" was under the Defendant's shirt, and the Defendant was gripping the handle of a firearm. After the Defendant fled the vehicle, Officer Hurst testified that he was still in possession of the Defendant's driver's license and paperwork.

Officer Hurst testified that after this incident with the Defendant he brought the following state charges: convicted felon in possession of a firearm, reckless driving, driving on a suspended license, misdemeanor speeding, and theft over five hundred. Officer Hurst stated that the Defendant was charged with "theft over five hundred," because once police ran a serial number on the firearm dropped by the Defendant, and the determination was made that the firearm was stolen. Officer Hurst then testified that he did not charge the Defendant with speeding or crossing the center

line, rather he charged the Defendant with reckless driving.

Officer Hurst identified a copy of his "in-car video" that he signed after viewing. Officer Hurst stated that he previously viewed the video, based on the fact that he initialed and dated the video. Officer Hurst testified that the video fairly and accurately represents the night of August 24, 2010 at 11:15 p.m. The in-camera recording was admitted as Exhibit 2.

Officer Hurst testified about the video recording taken from his in-car camera. The video reveals, and Officer Hurst testified, that he was traveling down an alley, westbound, between Linden Avenue and Magnolia Avenue. Officer Hurst testified that during this time he was approaching Harrison Street. [Exh. 2 at 23:10:56]. Officer Hurst testified that the video showed him turning onto Harrison Street. [Exh. 2 at 23:11:19]. Officer Hurst stated that the images of the video appeared choppy because when an officer is on regular patrol, the in-car video is set to record on "background mode" and records one frame per second. Officer Hurst identified the Defendant's vehicle on the video. [Exh. 2 at 23:11:31]. Officer Hurst testified that the intersection shown on the video is the intersection of MLK Avenue and Harrison Street. [Ex. 23:11:38]. Officer Hurst testified that it took nearly two block to catch up with the Defendant's vehicle. Officer Hurst stated that the time it took to catch up with the Defendant's vehicle indicated that he was speeding.

Once the Defendant's vehicle was stopped, Officer Hurst testified, and the video indicates, that he told the Defendant that he went "flying out of the Bi-Lo" and "flying down Harrison." [Exh. 2 at 23:13:15]. After his initial encounter with the Defendant, the video indicates that Officer Hurst was attempting to conduct a records check. [Exh. 23:15:36]. Less than a minute later, a police cruiser is seen traveling on the opposite side of the road toward the Defendant's vehicle. [Exh. 2 at 23:16:00]. Shortly thereafter, the video reveals the Defendant moving around

in driver's seat of the vehicle. [Ex. 2 at 23:16:16]. The video reveals Officer Hurst commanding that the Defendant stop moving around in the vehicle. [Ex. 2 at 23:16:17]. As Officer Hurst is directing the Defendant to stop moving, the video shows the Defendant fleeing the vehicle. [Ex. 2 at 23:16:27]. Officer Hurst is seen on the video, drawing his weapon, and once the Defendant flees the vehicle, chasing the him on foot. [Ex. 2 at 23:16:28]. Officer Hurst testified that he was running into an alley in pursuit of the Defendant.

### (ii) Cross-Examination

Attorney Moffatt questioned Officer Hurst, at which time the following additional testimony was elicited. Officer Hurst testified that he was working in East Knoxville, on the mid watch shift, on the night in question. Officer Hurst testified that he did not write a warrant against the Defendant for speeding, but he did write a warrant against the Defendant for reckless driving. Officer Hurst stated that the first time he encountered the Defendant's vehicle was as it traveled out of the parking lot of the Bi-Lo. Officer Hurst acknowledged that there is a house across the street from the Bi-Lo on Harrison Street with a fence and trees.

Officer Hurst stated that he was not in a position to pace the vehicle with his speed, nor did he use a radar to detect his speed. Officer Hurst testified that as he approached MLK Avenue, the Defendant's vehicle had already turned left and was traveling southward down Harrison Street. Officer Hurst stated that he had to stop at a stop sign at MLK Avenue, in part, because of a sports utility vehicle was traveling in the right of way. While Officer Hurst was stopped at the stop sign, he stated that the Defendant's vehicle was still traveling south on Harrison Street.

Officer Hurst stated that there are points east and west along MLK Avenue at the

intersection of MLK Avenue and Harrison Street. Officer Hurst testified that there is no stop sign at the intersection of MLK Avenue and Harrison Street, and that a person traveling through traveling west through Harrison would have the right of way. When writing a speeding ticket, Officer Hurst testified that it is important to be able to ascertain the speed at which the vehicle was traveling. Officer Hurst testified that he believed that the Defendant's vehicle was traveling at a speed of approximately 35 miles per hour, and that he felt that the charge of reckless driving encompassed all the traffic violations. Officer Hurst stated that reckless driving is defined as the willful or wanton disregard for public safety or property. Officer Hurst stated that the Defendant's vehicle is the only vehicle traveling south on Harrison street, and that there was no oncoming traffic in the Defendant's path. Officer Hurst testified that a sports utility vehicle traveling on MLK Avenue passed through several seconds after the Defendant. Officer Hurst testified that there was "a lot of foot traffic in that area to get to the gas station."

   Officer Hurst testified that he had been to the Bi-Lo around the time in question on previous occasions. Officer Hurst stated that he would expect the Bi-Lo to be open for business around 11:15 p.m. Officer Hurst stated that the Bi-Lo in the area in question is a place of activity at night.

   Officer Hurst testified that his approximation of the Defendant's speed, at thirty -five miles per hour, is not exact science. Officer Hurst stated that he was at a stop and the Defendant's vehicle was traveling down Harrison Street at the time he made his speed approximation. Officer Hurst acknowledged that if his judgment was off by 5 miles per hour, the Defendant was not breaking the law.

   Officer Hurst testified that he had reviewed the Affidavit of Complaint he filed in

state court.  Officer Hurst testified that he stated in the Complaint that the Defendant weaved into the wrong lane and continued south on Harrison Street.  Officer Hurst stated that it was his position that the video indicated that the Defendant's vehicle exited the Bi-Lo in the wrong lane and then turned south onto Harrison Street.  Officer Hurst stated that what he saw on the night in question was based on his eyesight, which was much clearer than the images indicated on the video.

Officer Hurst testified that he was aware of the Defendant and had heard his name before based on his work in the area.  Officer Hurst stated that he had no information that the Defendant was to be pulled over for any reason on the night in question.  When relaying the Defendant's tag number, Officer Hurst stated that he believed that Officer Headrick heard this information.  Officer Hurst testified that Officer Headrick could have run the Defendant's tag number from his vehicle.

Once the Defendant was stopped, Officer Hurst stated that the Defendant indicated that he was looking for his wallet and also listening to music.  After the Defendant complied with Officer's Hurst's verbal commands and he could see the Defendant's hands, Officer Hurst stated that he did not ask the Defendant to exit the vehicle because he would prefer that the Defendant remain inside.

Officer Hurst testified that he felt that the Defendant exited the Bi-Lo parking lot  at "not a normal rate of speed" onto MLK Avenue.  Officer Hurst stated that he believed the rate of speed on MLK Avenue was 35 miles per hour.  Officer Hurst testified that he told his partner that, given the circumstances, he thought that the Bi-Lo had been robbed.  Officer Hurst stated that his suspicion was aroused by the fact that the Defendant's vehicle exited the parking lot into the wrong lane of traffic and "took off down Harrison."  Officer Hurst testified that the area in which the Bi-Lo

gas station is located is in a high crime area, which also aroused his suspicion.

The in-car camera video was again shown to Officer Hurst. Officer Hurst testified that when he observed the Defendant's vehicle, he was entering the intersection of Parkview and Harrison Street. Officer Hurst testified that the only view he would have of the yellow lines on MLK Avenue is from Parkview Avenue. Officer Hurst stated that it appeared that the Defendant's vehicle "crossed over for just a second," but then appeared in the right lane as it turned onto Harrison Street.

The video indicates that a sports utility vehicle traveled in front of Officer Hurst while he was stopped at a stop sign. [Exh. 2 at 23:11:37]. Officer Hurst testified that the Defendant vehicle was not by the sports utility vehicle and continued traveling down Harrison Street. Officer Hurst testified, and the video indicates, that Officer Hurst put on his lights as the Defendant was turning onto Wilson. [Exh. 2 at 23:11:56]. A few seconds later, the Defendant's vehicle came to a stop. [Ex. 2 at 23:12:05].

Officer Hurst testified that when Officer Headwick arrived, he had not communicated his intent to command the Defendant to exit the vehicle. Officer Hurst testified that all communications between himself and Officer Headwick were represented in the video. Officer Hurst stated that he had not communicated with Officer Headwick via radio, and was on a different radio channel as Officer Headwick approached him. A few seconds after Officer Headwick appeared on the scene, the Defendant exited the vehicle. [Exh. 2 at 23:16:27]. Officer Hurst testified that the length of the stop up to the point the Defendant fled the vehicle was approximately four and a half minutes. Officer Hurst testified that the firearm was located approximately fifty feet from the vehicle.

Officer Hurst testified that a person could exit the Bi-Lo parking lot onto MLK

Avenue to the left or right of the gas pumps. Officer Hurst testified that this provides a wide area in which to exit the Bi-Lo onto MLK Avenue. A picture was presented to Officer Hurst which he identified as the east end of the Bi-Lo gas station. Officer Hurst testified that the picture appeared to be taken from Harrison Street. Officer Hurst stated that this picture fairly and accurately showed parts of the Bi-Lo parking lot. A van is indicated in the picture in front of the Bi-Lo parking lot and Officer Hurst testified that usually there are "vehicles parked there." Officer Hurst stated that "there's a little bit of a lip" that goes onto MLK Avenue from the Bi-Lo parking lot. Officer Hurst testified that a vehicle could turn onto MLK Avenue from the left of where the van is located in the picture. The picture was admitted at Exhibit 3.

Officer Hurst was again directed to a portion of the video. Officer Hurst stated that it was hard to understand on the video if the Defendant stated "that's crazy" in response to Officer Hurst's statement that the Defendant "came flying" out of the Bi-Lo parking lot.

### (ii) Redirect

Officer Hurst stated that he specifically observed the manner in which the Defendant exited the Bi-Lo parking lot into the wrong lane of MLK Avenue and "took off at a high rate of speed down Harrison." After this observation, Officer Hurst testified that he believed that the Bi-Lo had been robbed, and that he had no reason to think the Bi-Lo had been robbed aside from the manner in which the Defendant was driving. Officer Hurst testified that he did not receive any calls about a robbery at the Bi-Lo.

Officer Hurst testified that the objects and items that he viewed on the night in question were more clearly viewable than what is indicated on the video. Officer Hurst testified that

neither a fence nor trees obstructed his ability to see that the Defendant was in the left lane on MLK avenue before turning onto Harrison Street.

Officer Hurst testified that he turned on his emergency lights when he caught up with the Defendant's car. Officer Hurst stated that there is a stop sign at the intersection of Harrison Street and Wilson Avenue. Officer Hurst testified that it appeared that the Defendant rolled through the stop sign. Officer Hurst testified that there are limitations to the in-car camera before you turn on the emergency lights. Officer Hurst stated that the camera is in "background mode." When the camera is recording in "background mode," Officer Hurst stated that it records at one frame per second instead of twenty-four frames per second.

### (iv) Recross-Examination

Officer Hurst testified that there are limitations on what a person is capable of seeing at night. Officer Hurst stated that he has received radar training, as part of his academy training, on gauging the speeds of vehicles while remaining at a complete stop. Officer Hurst testified that during his radar training, he was required to estimate the speeds of vehicles while standing on the side of the road. Additionally, Officer Hurst testified that when he approximated the Defendant's speed, at certain times Officer Hurst's vehicle was moving and at certain times his vehicle was stopped.

Officer Hurst testified that he did not mention to the Defendant on the night in question that he rolled through a stop sign. In addition, Officer Hurst testified that he did not write the Defendant a ticket for rolling through a stop sign. Officer Hurst stated that he did not mention that the Defendant rolled through a stop sign in his Affidavit of Complaint.

## B. Testimony of Michael Chavis

### (i) Direct Examination

The Defendant called Michael Chavis to the witness stand. Mr. Chavis testified that he was currently employed with the Federal Defender Services of Eastern Tennessee and had worked there since 1997. Mr. Chavis stated that he is an investigator and is assigned to the Habeas Unit.

Mr. Chavis testified that he worked on the Defendant's case. Mr. Chavis stated that on December 29, 2010, he went with Charles Brown, another investigator, to videotape, take photographs of the scene, and take some measurements.

Mr. Chavis was shown a photograph and identified that the photograph was taken of a crossroad beginning at Parkview. Mr. Chavis stated that the picture showed the parking lot, the sign, and the top of the Bi-Lo. Mr. Chavis indicated that, from this picture, a garage was located below a white house blocked the view of the rest of the Bi-Lo. Additionally, Mr. Chavis stated that a white house that blocked a complete view of the Bi-Lo. Mr. Chavis stated that this photograph accurately reflected the scene from Parkview Avenue and Harrison Street on December 29, 2010. The photograph was entered as Exhibit 4.

Mr. Chavis was shown a second photograph. Mr. Chavis testified that this photograph was taken from the same intersection of Parkview and Harrison Street, but from a different angle. Mr. Chavis stated that he took the photographs at this intersection because it was his estimate that this was the first point that the Defendant's vehicle was seen exiting the Bi-Lo. Mr. Chavis stated that measurements were made of distances between Parkview Avenue and MLK Avenue. Measurements were taken by a stick "walking man measuring stick." Mr. Chavis stated that the "clicks as you go along to measure the distance." Mr. Chavis testified that he measured the

distance between Parkview Avenue and MLK Avenue as approximately 230 feet. Mr. Chavis stated that the measurement was taken from the "back end of Parkview Road" as it approaches MLK Avenue. The photograph was entered as Exhibit 5.

Mr. Chavis was shown another photograph. Mr. Chavis stated that the photograph depicted the corner where the Bi-Lo is located at the west side of the parking lot. The photograph was entered as Exhibit 6.


**(ii) Cross-Examination**

Mr. Chavis was directed to Exhibit 4. Mr. Chavis stated that the picture was taken at this location because it was "where we first could indicate from the video where you would be able to see [the Defendant] coming out of [the Bi-Lo]." Mr. Chavis stated that you could see the intersection of Harrison Street and MLK Avenue from his location while taking the photograph.

Mr. Chavis was shown Exhibit 5. Mr. Chavis testified that the picture was taken at a different angle than Exhibit 4, as it was from a corner to the west of the previous picture. Mr. Chavis testified that he could see the intersection of MLK Avenue and Harrison Street from the angle he took the photograph. Mr. Chavis was then directed to Exhibit 6. Mr. Chavis stated that the photograph was taken much closer to the intersection of MLK and Harrison, and that there were no obstructions in the picture of his view of the intersection.

Mr. Chavis was shown an additional photograph. Mr. Chavis stated that the picture depicted MLK Avenue and Harrison Street. The photograph was entered as Exhibit 7.

Mr. Chavis indicated that the yellow-center line of MLK Avenue could be seen in

Exhibit 4.[2]


### (iv) Redirect

Mr. Chavis stated that the photographs entered as Exhibits 4, 5, 6, and 7 were taken between 2:00 and 3:00 p.m.


## III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. A traffic stop conducted by a police officer is a "seizure" under the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979). Therefore, any evidence seized as a result of an illegal traffic stop must be suppressed as "fruits of the poisonous tree." United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999) (quoting Wong Sun v. United States, 371 U.S. 471, 484 (1963)). The Defendant contends that his rights under the Fourth Amendment were violated because the officer had no basis to stop his vehicle or subsequently to search his person or his car. [Doc. 17 at 1]. Specifically, he argues that (1) Officer Hurst lacked probable cause to stop his vehicle and to detain him; and (2) the handgun and ammunition were obtained as a result of the illegal traffic stop and must be suppressed. [Doc. 17 at 4]. The Court will examine each of these arguments in turn.

---

[2]Initially, Mr. Chavis indicated that he believed the yellow-line of MLK Avenue, indicated in Exhibit 4, was a curb. After Attorney Norris approached the witness with Exhibit 4, Mr. Chavis acknowledged that he could see the yellow-center line of MLK Avenue.

## A. Propriety of the Traffic Stop

The Court will first address whether Officer Hurst properly stopped the Defendant's vehicle on August 24, 2010. The Defendant argues that Officer Hurst lacked probable cause to stop his vehicle. [Doc. 17]. The Government responds that "[t]here is no merit to defendant's argument that the traffic stop in question violated the Fourth Amendment because KPD Officer Hurst had probable cause to believe the defendant had committed several traffic infractions." [Doc. 20 at 4].

Provided that an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment."[3] United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. Id. at 388. Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable

---

[3]The Court notes that "[t]here is a degree of confusion in this circuit over the legal standard governing traffic stops, and in particular over whether police officer must have reasonable suspicion or probable cause in order to make a valid stop." United States v. Hughes, 606 F.3d 311, 316 n.8 (6th Cir. 2010) (internal citations and quotations omitted). The Sixth Circuit Court of Appeals has "developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008) (citing Gaddis v. Redford Twp., 364 F.3d 763, 771 n.6 (6th Cir. 2004)). The probable cause standard is still applicable to completed civil misdemeanors, while the reasonable suspicion standard applies to ongoing civil misdemeanors. United States v. Simpson, 520 F.3d 531, 541 (6th Cir. 2008). In this case, the Government argues that the higher standard of probable cause is met. Accordingly, the Court does not analyze whether there was an ongoing misdemeanor traffic violation to which reasonable suspicion would support the traffic stop.

cause means a substantial chance or likelihood of criminal conduct. Ferguson, 8 F.3d at 392 (citing

Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983)). If a traffic stop is properly supported by probable

cause, "it is irrelevant what else the officer knew or suspected about the traffic violator at the time

of the stop." Id. at 391.

A probable cause determination is based upon the knowledge of the officer at the time

of the stop and "courts may not determine there was probable cause by looking at events that

occurred after the stop." Id. at 394. Further, the Sixth Circuit Court of Appeals has stated that:

> If an officer testifies at a suppression hearing that he in fact did not
> see the traffic violation or did not have probable cause to believe a
> violation had occurred, but only discovered after the stop or the arrest
> that the suspect had committed a traffic violation, a court could not
> find that probable cause existed. Such a stop would be unreasonable
> under the Fourth Amendment.

Id. [4]

In this case, Officer Hurst testified that the Defendant exited the Bi-Lo gas station

onto MLK Avenue "straddling" the yellow center line, "made an abrupt turn [onto] Harrison Street,

and accelerated down Harrison." [Tr. 6]. At the hearing, the Defendant argued that Officer Hurst's

view of the Bi-Lo was obstructed, no speeding violation occurred, and that the Defendant's actions

do not support a reckless driving offense under Tenn. Code Ann. § 55-10-205. The Government

contends that probable cause supports Officer Hurst's traffic stop of the Defendant's vehicle because

the Defendant was operating his vehicle in violation of Tenn. Code Ann. § 55-8-152 (speeding),

---

[4]While Officer Hurst testified at the hearing that it appeared that the Defendant "rolled
through" the stop sign at the intersection of Harrison and Wilson, this violation was not
addressed in the parties' briefs. [Tr. 50]. Further, Officer Hurst did not mention the violation at
the time of the stop or indicate that he conducted a traffic stop based on the Defendant "rolling
through" a stop sign. Therefore, the Court will not consider such evidence.

Tenn. Code Ann. § 55-10-205 (reckless driving), and Tenn. Code Ann. § 55-8-123 (crossing left of center).  [Doc. 20 at 6].

### (1) Tenn. Code Ann. § 55-8-152: Speeding

Tenn. Code Ann. § 55-8-152 states in pertinent part that:

> Except as provided for certain counties in subdivision (d)(2), counties and municipalities are authorized to establish special speed limits upon any highway or public road of this state within their jurisdiction, except at school entrances and exits to and from controlled access highways on the system of state highways, which is adjacent to school grounds that are devoted primarily to normal school day activity. Such speed limit shall be enacted based on engineering investigation, shall not be less than fifteen miles per hour (15 mph) and shall be in effect only when proper signs are posted within a warning flasher or flashers in operation and only while children are actually present.

Tenn. Code. Ann. § 55-8-152 (d)(1)(A).

The posted speed limit on Harrison Street is thirty miles per hour. Officer Hurst testified that he observed the Defendant's vehicle accelerate down Harrison Street.  Officer Hurst stated that he believed, based on his knowledge and experience, that the Defendant was operating his vehicle at a speed of thirty-five miles an hour in a thirty mile per hour zone.  Officer Hurst explained that he had received radar training at which he was required to gauge the speeds of vehicles while remaining at a complete stop by standing on the side of the road.  Officer Hurst also testified that he had previously conducted hundreds of traffic stops for speeding. [Tr. 49].  The Court credits Officer Hurst's testimony because of his training, experience, and knowledge in estimating the speed of vehicles.

Moreover, Officer Hurst stated that he observed the Defendant travel at a high rate

of speed down Harrison Street and that it took him "nearly two blocks to catch up with the Defendant," indicating to Officer Hurst that the Defendant was speeding. While the Defendant noted at the hearing that Officer Hurst was stopped at a stop sign for a period of time, rendering him unable to detect the Defendant's speed, Officer Hurst testified that his experience, his observations on the night in question, and the time period in which it took his vehicle to catch up with the Defendant were all factors that indicated that the Defendant was speeding. See United States v. Gatewood, No. 02-20172-G, 2002 WL 31488283, *3 (W.D. Tenn. Nov. 4, 2002) (finding that a traffic stop was supported by probable cause when the officer "reasonably believed, based on his own knowledge and experience, that the driver was speeding and driving without a valid license").

While the Defendant argued at the hearing that Officer Hurst's failure to issue a citation for speeding indicated that he did not have enough proof that the Defendant was speeding, the fact that Officer Hurst decided not to cite the Defendant for speeding "does not render the stop unlawful after the fact." United States v. Garrido, 467 F.3d 971, 978 (6th Cir. 2006). Further, the video indicates that Officer Hurst told the Defendant that he came "flying out of the Bi-Lo" and "flying down Harrison." [Exh. 2 at 23:13:13]. These statements indicate that Officer Hurst stopped the Defendant for the traffic violation of speeding, and the fact that Officer Hurst failed to "issue a citation [for speeding] is legally irrelevant." United States v. Lake, No. 1:08-CR-4, 2008 WL 4614336, at *4 (E.D. Tenn. Oct. 15, 2008); see United States v. Herbin, 343 F.3d 807, 810 (6th Cir. 2003) (holding that "continuing to detain a motorist does not become unlawful just because the officer has determined in his own mind not to pursue the traffic violation") (citing Ohio v. Robinette, 519 U.S. 33, 38 (1996)).

The Court finds that based on Officer Hurst's training, knowledge, and experience,

Officer Hurst could reasonably conclude that the Defendant was speeding at a rate of five miles over the speed limit. Accordingly, the Court finds that probable cause supported Officer Hurst's traffic stop.

**(2) Tenn. Code Ann. § 55-10-205: Reckless Driving**

Tenn. Code Ann. § 55-10-205(a) provides that, "[a]ny person who drives any vehicle in willful or wanton disregard for the safety of persons or property commits reckless driving." Willful or wanton disregard for safety is a "heedless and reckless disregard for another's rights, with the consciousness that the act or omission to act may result in injury to another." State v. Wilkins, 654 S.W.2d 678, 679 (Tenn. 1993) (citations and quotations omitted). Willful and wanton disregard is determined from the circumstances of the case. See id. at 680. The issue, however, "is not whether a Tennessee court would have found defendant guilty of the traffic infraction, but whether the officers had probable cause to believe that a violation had occurred." United States v. Johnson, 242 F.3d 707, 709-10 (6th Cir. 2001).

At the hearing, the Defendant contended that the reckless driving charge was used as a "catch-all." The Defendant argued that a charge of reckless driving was not supported for the following reasons: (1) there were no other persons or property on the road; (2) that the intersection of Harrison Street and MLK Avenue was located two hundred thirty feet away from where Officer Hurst saw the Defendant's vehicle making it difficult to ascertain whether the Defendant crossed the yellow center line; (3) Officer Hurst's view of the intersection of Harrison Street and MLK Avenue was obstructed by a house, trees, and a fence; and (4) the video does not indicate that the vehicle is

crossing on the left side of MLK Avenue.

In this case, Officer Hurst testified that he observed the Defendant exit the Bi-Lo straddling the yellow center line, abruptly turn onto Harrison Street, and accelerate down Harrison Street. The fact that Officer Hurst testified that the Defendant was traveling five miles over the posted speed limit on Harrison Street is not enough to support a conviction for reckless driving. See State v. Miller, No. W2001-02045-CCA-R3-CD, 2002 WL 1483197, at *3 (Tenn. Crim. App. Feb. 15, 2002) (finding the defendant "was exceeding the speed limit by twelve miles per hour, this alone is insufficient" to support a charge of reckless driving). However, Officer Hurst testified that he charged the Defendant with reckless driving based on all the traffic violations he observed that night, specifically, that the Defendant went "flying out of the Bi-Lo," crossed the yellow-center line of MLK Avenue, abruptly turned onto Harrison Street, and sped down Harrison Street.[5] On the other hand, the Defendant is correct that the video reflects no oncoming traffic when the Defendant pulled onto Harrison Street, which indicated that the Defendant's driving did not place other persons in danger. See State v. Archey, No. M2001-02148-CCA-R3-CD, 2002 WL 1732355, at *4 (Tenn. Crim. App. July 26, 2002) (finding the presence of people near a red light to be a relevant circumstance for reckless driving).

Even if the Defendant did not violate Tenn. Code Ann. § 55-10-205, that does not

---

[5]While the Defendant argues that a house, trees, and a fence obstructed Officer Hurst's view of MLK Avenue and that the video does not indicate that the Defendant crossed the yellow center line, Officer Hurst testified that he observed the Defendant cross the yellow center line. Officer Hurst testified that he was able to see more on the night in question than the video indicates. The Court notes that the video was in "background mode," showing only one frame per second rather than the streaming video speed of twenty-four frames per second. The Court credits Officer Hurst's testimony regarding his observations on the night in question.

necessarily indicate that Officer Hurst lacked probable cause for the traffic stop.  Hughes, 606 F.3d

at 320.  The Sixth Circuit Court of Appeals has found that:

> Having probable cause is not the same thing as being absolutely
> certain; it is possible (though obviously more difficult) for an officer
> to have probable cause for a stop even where the individual being
> stopped has not actually violated the law.  The requirements of
> probable cause are satisfied where the facts and circumstances within
> their (the officers') knowledge and of which they had reasonably
> trustworthy information (are) sufficient in themselves to warrant a
> man of reasonable caution in the belief that an offense has been or is
> being committed.

Id. (internal citations and quotations omitted).  In Maryland v. Pringle, the Supreme Court

concluded that "[t]he substance of all the definitions of probable cause is a reasonable ground for

belief of guilt."  540 U.S. 366, 371 (2003) (quotations omitted).  Therefore, the question for the

Court to decide is not whether the Defendant was actually violating Tenn. Code Ann. § 55-10-205,

instead the inquiry becomes whether Officer Hurst reasonably believed that the Defendant was

driving recklessly under Tenn. Code Ann. § 55-10-205.  See Hughes, 606 F.3d at 320.

As stated previously, the Court finds Officer Hurst's testimony to be credible.  At the

hearing, Officer Hurst testified that the Defendant's exit from the Bi-Lo parking lot, his crossing the

center line of MLK Avenue, his "abrupt turn" onto Harrison Street, and his acceleration down

Harrison Street led Officer Hurst to believe a traffic violation was occurring.  Notably, the erratic

manner in which the Defendant exited the Bi-Lo and accelerated down Harrison Street caused

Officer Hurst to believe that the vehicle had just robbed the Bi-Lo.  Officer Hurst testified that he

had no reason, other than the manner in which the Defendant was driving, to believe the Bi-Lo had

been robbed.  In addition, Officer Hurst testified that the Defendant's driving aroused his suspicion

because he was patrolling a high crime area. [Tr. 36].  On the video, Officer Hurst asked the

Defendant why he was "driving so crazy" and then stated that the Defendant came "flying out of the Bi-Lo" and "flying down Harrison." [Exh. 2 at 12:13:10-17]. Officer Hurst testified that the Defendant never denied the allegations.[6]

Moreover, Officer Hurst testified at the hearing that he wrote a warrant against the Defendant for reckless driving and that reckless driving was the "willful or wanton disregard for disregard for public safety or property." [Tr. 30]; see Hughes, 606 F.3d at 320 (finding that it was necessary for the district court to make the factual determination of whether the officer on the night in question knew of the rule codified in 12.40.080). Further, Officer Hurst testified that he had conducted "several hundred" traffic stops and that he wrote a warrant against the Defendant for reckless driving because he believed "that the reckless driving charge encompassed all the traffic violations [he] saw."[7] [Tr. 5, 30]. The Court finds Officer Hurst's testimony on this issue was not successfully impeached by cross-examination or the photographs and testimony of Witness Chavis.

Therefore, the Court finds that Officer Hurst reasonably believed that the Defendant was recklessly driving under Tenn. Code. Ann. § 55-10-205, and the fact that the Defendant may not have actually violated Tenn. Code. Ann. § 55-10-205 is legally irrelevant to the question of probable

---

[6]At the hearing, the Defendant argued that the video indicated that he said "that's crazy" in response to Officer Hurst. [Exh. 2 at 23:13:22]. The Court notes that the Defendant laughed at Officer Hurst, noting that he left the Bi-Lo after buying cigarettes. After Officer Hurst stated that the Defendant came "flying out of the Bi-Lo" and "flying down Harrison," the Defendant again starts laughing, is heard saying something about an "ex-girlfriend," and then "that's crazy." [Exh. 2 at 23:13:13-22]. The Court finds that it is unclear whether the Defendant is responding to Officer Hurst's statement or his own statement about his ex-girlfriend.

[7]The Government raised the issue that Tenn. Code Ann. § 55-8-123 (crossing left of center) was violated by the Defendant. The Court finds that such a violation was subsumed by the violation reckless driving.

cause.  Accordingly, the Court finds that Officer Hughes had probable cause to stop the Defendant for reckless driving.

### (3) The Firearm

In summary, the Court finds that Officer Hurst had probable cause to stop the Defendant due to speeding and reckless driving in violation of Tenn. Code Ann. § 55-8-152 and Tenn. Code Ann. § 55-10-205.

At the time the Defendant fled the scene, Officer Hurst was in the process of completing a records check after the Defendant turned over his driver's license.[8]  "Requesting a driver's license, registration, rental papers, running a computer check thereon, and issuing a citation do not exceed the scope of a traffic stop for a speeding violation."  United States v. Bonilla, 357 F. App'x 693, 696 (6th Cir. 2009) (internal citations omitted).   Thus, Officer Hurst's records check was "reasonably relate[d] to the purpose of the original stop" and the Defendant was temporarily seized.  Bonilla, 357 F. App'x at 696 (internal citations omitted).  Before Officer Hurst completed the records check, the Defendant fled his vehicle.  As a result, Officer Hurst found the Defendant's abandoned a firearm in plain view.  Therefore, the firearm was properly seized by Officer Hurst after

---

[8]While the Defendant does not challenge the scope of the traffic stop before the Defendant's flight from the vehicle, the Court notes that Officer Hurst could require the Defendant to wait inside the vehicle while Officer Hurst issued the traffic citation.  An officer who stops a person for a traffic violation based upon probable cause can detain the person while he or she completes a records check and issues a citation.  See United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999).  In addition, while neither party disputes that the length of the traffic stop, the Court notes that length of the stop was not unreasonable when the Defendant fled the scene approximately four and a half minutes into the traffic stop and during Officer Hurst's records check.  See United States v. Ellis, 497 F.3d 606, 613-14 (6th Cir. 2007).

the Defendant fled a lawful traffic stop and abandoned the firearm.  See California v. Greenwood, 486 U.S. 35, 41 (1988) (finding that "the police cannot be reasonably expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public").

Accordingly, the Court recommends that the motion to suppress the evidence found as a result of a lawful traffic stop be denied.

**B.  Seizure of the Firearm**

Even if the District Court were to find that the traffic stop was not supported by probable cause, the Court will analyze whether the seizure of the firearm was the result of a new and distinct crime rather than the product of the traffic stop.

The Defendant argues that because the stop of his vehicle lacked probable cause, all evidence seized as a result of the stop must be suppressed as "fruit of the poisonous tree." [Doc. 17 at 1].  Specifically, the Defendant argues that his right to be free of an illegal seizure was violated, and thus, the firearm and any ammunition recovered by the Government as a result of the traffic stop must be suppressed.  [Doc. 17 at 1-4].  The Government argues that even if the Court finds that the officer lacked probable cause to conduct a traffic stop, "suppression of the evidence is not the appropriate remedy because the seizure of the evidence was the product of a new and distinct crime and was not the product of the traffic stop."  [Doc. 20 at 7].

Any evidence seized as a result of an illegal traffic stop must be suppressed as "fruits of the poisonous tree."  United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999) (quoting Wong Sun v. United States, 371 U.S. 471, 484 (1963)).  Even if the traffic stop in this case was improper, "[i]t

is widely recognized that if a suspect's response to an illegal stop is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime." United States v. Castillo, No. 99-5463, 2000 WL 1800481, at *5 (6th Cir. Nov. 28, 2000) (internal citations and quotations omitted); see United States v. Allen, 619 F.3d 518, 526 (6th Cir. 2010) (finding that "the act of fleeing from police officers constituted a new, distinct crime that rendered evidence subsequently seized admissible"). In Castillo, officers were performing a check of the defendant's license following a traffic stop when the defendant fled the scene in a vehicle. Id. at *1, 6. As a result, the officers were led on a high speed chase through a residential area. Id. Subsequently, the defendant sought to suppress "the cocaine found in the blue bag near his abandoned vehicle . . . as 'fruit of the poisonous tree.'" Id. at *4. The court stated that:

> In determining whether evidence obtained following an illegal seizure is subject to suppression, the "question in such a case is 'whether granting establishment of the primary illegality, the evidence to which [the] instant object is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"

Id. at *5 (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)). The court held that the defendant's flight from the officer "constituted an intervening act that purged the taint of his detention, assuming, arguendo, that his continued detention by [Officer Bales] violated the Fourth Amendment." Id. at *6; see United States v. Gross, 624 F.3d 309, 320 n.4 (6th Cir. 2010) (stating that "if a suspect's response to an illegal stop is a new and distinct crime, such as flight, any evidence recovered incident to the arrest for that crime is not tainted by the unlawfulness of the initial detention").

In this case, the Court finds that the Defendant's flight from the traffic stop,

constituted an "intervening act" that would purge the primary taint of an illegal seizure. Castillo, 2000 WL 1800481, at *6. Similar to Castillo, Officer Hurst was in the process of conducting a records check at the back of his police cruiser, after directing the Defendant to remain inside the vehicle and stop moving around. Officer Hurst moved to the back of his police cruiser to conduct the records check because, based on the Defendant's earlier movements, he wanted to ensure that if the Defendant was in possession of a firearm he "would have some cover" between himself and the Defendant. As Officer Headrick's police cruiser approached the scene, the Defendant started to move around again in the vehicle. Officer Hurst stated, and the video indicates, that he drew his weapon and started giving the Defendant "verbal commands again to stop moving around." [Tr. 16-17]. The Defendant responded to Officer Hurst's commands by opening the driver's side door and fleeing from the officers on foot. Officer Hurst testified that he was in pursuit of the Defendant when he heard "the distinct sound of metal" on the paved part of the alley. [Tr. 18]. At the spot where he heard the noise, Officer Hurst found a black Glock firearm. The Defendant's flight from the scene, after Officer Hurst directed him to stop moving around in the vehicle, was an intervening act which forced the officers to chase the Defendant and purged the taint of an illegal seizure.

Moreover, the Defendant abandoned the firearm in the alley during the officers' pursuit. The Defendant abandoned the firearm in an alley, a location where the Defendant had no expectation of privacy, as he fled from officers. Accordingly, the officers could properly seize the firearm after the Defendant abandoned it in the alley. See United States v. Foster, 65 F. App'x 41, 46 (6th Cir. 2003) (holding that "[s]uch abandonment extinguishes any reasonable expectation of privacy the defendant might once have had in the property, together with any accompanying Fourth

Amendment protections" after the defendant had fled the scene and abandoned his vehicle).[9]

Moreover, the abandonment of evidence is more flagrant than in <u>Castillo</u>, because here, the firearm was abandoned in an alley and in plain view of Officer Hurst, whereas, the officers in <u>Castillo</u> discovered the evidence at issue as a result of a search of the Defendant's abandoned bag. <u>See</u> <u>Abel v. United States</u>, 362 U.S. 217, 241 (1960) (holding the warrantless search and seizure of abandoned property does not violate the Fourth Amendment); <u>United States v. Britton</u>, 335 F. App'x 571, 576 (6th Cir. 2009) (finding that "[o]nce the loaded handgun was dropped in a place where the defendant had no reasonable expectation of privacy, there is no sensible rule that would prevent the police officer from picking it up").

   The Court finds that officers discovering a firearm fifty feet from the scene of the traffic stop could certainly seize it, whether the gun was dropped in the alley by the Defendant or another individual. Ultimately, the gun was abandoned and later turned out to be stolen. In such a case, seizure of the weapon was proper. Evidence at trial that the Defendant possessed the weapon is up to the Government's proof on that issue. But such proof is not bound by whether the initial stop was proper or not, as the new crime, the act of fleeing, was an intervening act.

---

[9]The Government's brief discusses ammunition found under the Defendant's vehicle after his flight from the scene. However, no evidence regarding ammunition was presented at the hearing. Therefore, the Court will not address whether ammunition was found under the Defendant's car after his flight from the scene.

## IV. CONCLUSION

After thoroughly considering the parties briefs and arguments, the testimony at the

evidentiary hearings, and the relevant caselaw, the Court **RECOMMENDS** that the Defendant's

Motion to Suppress Evidence [Doc. 17] be **DENIED**.[10]

Respectfully submitted,

_s/ C. Clifford Shirley, Jr._
United States Magistrate Judge

---

[10]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).